BOWES, Judge.
Defendants appeal the decision of the trial judge finding plaintiff partially disabled under LSA R.S. 23:1221(3)[1] and *607 awarding her compensation, medical expenses and penalties and legal fees under LSA R.S. 23:1201.2.[2] We affirm the judgment of the trial court.
On December 15, 1980, plaintiff, Carol Clark, was involved in a vehicular accident while driving a 1974 van owned by her employer, Park ’N Fly of Louisiana, Inc. It was stipulated at trial that plaintiff was in the course and scope of her employment, as a driver for Park ’N Fly, at the time of the accident. The accident resulted in moderate damage to the Park ’N Fly van and minor damage to the bus.
In response to questions immediately following the accident, Mrs. Clark stated that she was not injured. However, she testified that as the day progressed she started “feeling uncomfortable” and that by 9:00 p.m. her neck and back were hurting to such a degree as to necessitate her leaving work early.
Under direct examination, Mrs. Clark testified as follows:
Q Tell me what happened after you went home with regards to your physical condition?
A Well, as time was going on, I was just hurting a little more, a little more. And that happened on a Monday. Well, Tuesday and Wednesday was my days off, anyway. So I just went on home, and I just started hurting. And, you know, it was just getting more concentrated and more concentrated in my back and neck area.
Q Did you seek medical attention?
A Yes. I called Dr. Aiken’s office and got an appointment with him, but I couldn’t see him until the 30th of December. And I really was hurting too bad to wait until then, so I went to my gynecologist, and he prescribed some pain pills for me to hold me over until I could see Dr. Aiken.
B Who was your gynecologist?
A Calvin Jackson. I think I saw him two days after on that Wednesday. I saw him on that Wednesday.
Plaintiff was treated by Dr. David Aiken from December 30,1980 through March 13, 1981, for complaints involving Mrs. Clark’s neck and lower back. Dr. Aiken, when questioned as to the cause of Mrs. Clark’s injuries stated, that, in his opinion, her neck and back problems .resulted from the accident of December 15, 1980. Dr. Aiken explained his decision to discontinue treating the patient thusly:
I saw her next on March 13th, and there was still tenderness in the upper right trapezius muscle. [She was] still dependent on her collar and corset. And complaining of her neck and low back. And it was midline and paraspinal tenderness in the low back from level L3 *608 to the sacrum. And she was still having some pins and needles or numbness and various odd sensations in the right lower extremity. And I decided that we were really not making any good progress during the past month or more, and that she should therefore see an orthopedic surgeon in consultation. So, I did arrange this to be seen by such a surgeon [sic], and that was March 13th, 1981. And he took over and I didn’t see her again after that.
The surgeon to whom Mrs. Clark was referred was Dr. Michael McCutcheon, who treated appellee from March 20, 1981 through April 21, 1982, when the doctor left New Orleans to practice in New Mexico.
Dr. McCutcheon’s deposition was taken in his office in Albuquerque, New Mexico, on January 26, 1983. In his deposition, Dr. McCutcheon stated “my first impression was that she had an acute cervical strain with possible early cervical spondylosis, which is she had symptoms that she may have had problems with a disc in her neck. And then I said acute lumbar sprain, and I thought there was an intervertebral disc injury in her lumbar spine.” It was Dr. McCutcheon’s opinion that the cause of Mrs. Clark’s symptoms were related to the December 15, 1980 accident.
Dr. McCutcheon instituted a conservative regimen of treatment instructing the patient to continue wearing the lumbar corset prescribed by Dr. Aiken, but to try to wean herself from the cervical collar which had also been prescribed. The doctor also advised Mrs. Clark to continue with her present medication. When there was no appreciable improvement in her symptoms, the doctor had Mrs. Clark hospitalized for tests during June 1981. The tests, which included two myelograms, proved inconclusive but led Dr. McCutcheon to believe the patient was suffering from a lumbar disc problem. The doctor continued to treat Mrs. Clark conservatively, seeing her on July 13, 1981, November 6,1981, December 8, 1981, and April 21, 1982. At this point, Dr. McCutcheon left New Orleans and his position in the office was filled by Dr. Bruce E. Razza, who took over the treatment of Mrs. Clark.
Dr. Razza first saw Mrs. Clark in June 1982 and, from this examination, he concluded the following:
She had diminished range of motion of her back and she had pain — complaints of pain upon moving her legs up to eighty degree position. This, again, I felt was consistent with her condition of lumbar spondylosis, which was my working diagnosis. It was also consistent with Dr. McCutcheon’s impression of her. He had seen her previously in our office complex, and his clinical impression as recorded in our records was acute lumbar strain with probable interverte-bral disc injury. Intervertebral disc injury is one form of lumbar spondylosis. So, it’s a matter of semantics. We are basically talking about the same thing. [...]
I worded it probably post traumatic degenerative disc disease without signs of gross herniation. Which again is, I’m trying to say, not actual disc rupture, but a disc injury following an insult or traumatic event.
Dr. Razza’s testimony indicates that he chose to follow the regimen of treatment established by his predecessors:
She had been on conservative therapy and we wished to continue that at that time. I emphasized anti-inflammatory, use of her brace, a chairback brace for support because if the disc isn’t doing its job as a cushion, well, it needs additional help. So, exercise to tone up the muscles so they can pitch in and take some stress off the disc. That is part of the treatment, use of a brace as additional support, anti-inflammatory medication, get rid of the residual irritation that sets up around the disc segment that was in trouble.
When Mrs. Clark showed no improvement on her September 13, 1982 visit, Dr. Razza suggested hospitalization for a lumbar discogram. She was admitted to St. Charles General Hospital and the disco- *609 gram was performed September' 21, 1982. Following evaluation of the test results, Dr. Razza performed a two-level lumbar laminectomy and fusion with a pelvic bone graft on September 23, 1982. Mrs. Clark was discharged October 1, 1982, but had to be re-hospitalized for post surgical complications from October 15-26, 1982, and, again, November 11-17, 1982. As a consequence of the surgical procedures, Dr. Raz-za assigned plaintiff a thirty per cent (30%) anatomical disability.
Following the accident of December 15, 1980, plaintiff-appellee was paid compensation by the Hartford Accident and Indemnity Company, Park ’N Fly’s compensation carrier, from January 1981 through October 26, 1981. The insurance company’s sole reason for terminating compensation payments to Mrs. Clark was a necessarily inconclusive medical report based upon an incomplete physical examination by appellant’s physician, Dr. Richard W. Levy, with his accompanying review of Mrs. Clark’s medical records. Dr. Levy stated that when he advised Mrs. Clark that his examination of her would require her to remove her back brace, bend her back and raise her legs, she declined to do so (because she had just done all this during a neurological examination by Dr. Boston in the same office), and he then terminated the examination.
When questioned why Dr. Levy’s examination was incomplete, Mrs. Clark stated:
Well, just before that I had seen Dr. Boston, and she was in his same office. And I had gone through a complete physical with her with the bending and stooping and everything. And I asked him if he was going to have me go through this. I said, “Because if I don’t have to, I really don’t want to because it’s a real painful process.” And he said, “Well, if you don’t want it, we don’t have to.” And that was that.
This is a very understandable reaction from a lay person whose chief complaint was one of pain and who obviously had no idea that such action would result in her payments being terminated.
Following what can only be termed an inconclusive medical examination by Dr. Levy, defendants neither requested Mrs. Clark to return to Dr. Levy for a complete examination, nor did they make it clear to her or her attorney that if she failed to submit to a complete medical examination, they would terminate her benefits. Under these circumstances, we believe they were obligated to do so.
We also find it significant that the great majority of Dr. Levy’s testimony is concerned either with events that happened after October 26, 1981 or with examinations made of Mrs. Clark by his partner, Dr. Susan Boston, who was attempting to find the cause of Mrs. Clark’s reported headaches. In her own testimony at the trial, Dr. Boston stated that she did not examine Mrs. Clark’s lumbar spine.
We agree with our brother judges of the Third Circuit who, in Delco v. Heritage Manor Nursing Home, 441 So.2d 309 (La.App. 3rd Cir.1983) stated:
In compensation cases the plaintiff has the burden of showing that more probably than not an employment accident occurred and that it had a causal relation to the disability. Harris v. Louisiana-Pacific Corp., 420 So.2d 1220 (La.App. 3rd Cir.1982). A worker’s pre-exist-ing condition does not bar his recovery under workmen’s compensation because the employer takes the worker as he finds him. Guillory v. U.S. Fidelity & Guaranty Ins. Co., 420 So.2d 119 (La.1982). An employee’s disability is com-pensable if a work-related accident aggravates or accelerates a pre-existing condition to produce disability. Cadiere v. West Gibson Products, Co., Inc., 364 So.2d 998 (La.1978).
 The question of whether there is a causal relationship between the disability and the employment is a question of fact. Moreau v. Houston General Ins. Co., 386 So.2d 151 (La.App. 3rd Cir.1980). A factual determination by the trial court should not be reversed unless the trial court was clearly wrong from an examination of the record as a whole. *610 Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
As a general rule, the treating physician’s testimony should be given more weight than that of a doctor who examines a plaintiff for diagnosis only. Ellis v. Rapides Parish School Board, 419 So.2d 990 (La.App. 3rd Cir.1982).
In the instant case, the trial court found that Mrs. Clark suffered a job-related injury in the course and scope of her employment with Park ’N Fly and that plaintiff was partially disabled as a result of her accident. We find no error in that conclusion.
Recently, in Reed v. Louisiana HyPro, Inc., 446 So.2d 879 (La.App. 1st Cir. 1984), the First Circuit held that:
An injured employee’s benefits may not be stopped on the basis of inconclusive medical reports. It is incumbent upon insurers to make reasonable efforts to ascertain the employee’s exact medical condition at the time benefits are stopped. Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983); Salvador v. Slidell Industries, Inc., 415 So.2d 511 (La.App. 1st Cir.1982).
We agree with this position and find that the trial judge was correct in his conclusion that the appellants’ discontinuance of Mrs. Clark’s compensation benefits was arbitrary, capricious and without probable cause.
Accordingly, for the foregoing reasons, the judgment of the district court is affirmed. Appellants are to pay all costs of this appeal.
AFFIRMED.

. LSA R.S. 23:1221(3) states in pertinent part:
(3) For injury producing partial disability of the employee to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience, sixty-six and two-thirds per centum of the difference between the *607 wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury, was particularly fitted by reason of education, training, and experience, during the period of disability....

. LSA R.S. 23:1201.2 states:
Any employer whose liability for claims arising under the provisions of this Chapter is not covered by insurance, shall pay the amount of any claim due under the provisions of this Chapter, within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious or without probable cause, shall subject the employer to a penalty in addition to the amount of claim due of 12% of the total amount of such claim, payable to the claimant, together with all reasonable attorney’s fees for the prosecution and collection of such claim, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due, and all reasonable attorney’s fees for the prosecution and collection of such amount. Any such employer who at any time discontinues payment of claims due and arising under the provisions of this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the penalties set forth above, payable to the claimant together with all reasonable attorney’s fees for the prosecution and collection of such claims. The provisions of R.S. 23:1141 limiting the amount of attorney’s fees shall not apply in cases wherein the employer is found liable for penalties and attorney’s fees under the provisions of this Section.